## PETER WILLIAMS *v.* BEST CLEANERS, INC., ET AL. (15171)

Callahan, Borden, Berdon, Katz and Palmer, Js.

Argued March 17, 1995—decision released January 23, 1996*

* The motions by the named defendant and by the defendant Broadbrook Cleaners et al. for reargument were granted March 5, 1996. This opinion has been superseded by *Williams* v. *Best Cleaners, Inc.*, 237 Conn. 490, 677 A.2d 1356 (1996).

*Michael J. Belzer*, assistant attorney general, with whom, on the brief, were *Richard Blumenthal*, attorney general, and *William J. McCullough*, assistant attorney general, for the appellant (defendant second injury fund).

*Michael J. Finn*, with whom was *Robert G. Montstream*, for the appellee (named defendant).

*Margaret E. Corrigan*, with whom, on the brief, was *James L. Pomeranz*, for the appellees (defendant Broadbrook Cleaners et al.).

BERDON, J. The principal issue in this appeal from the workers' compensation review board is whether a "disability" is to be evaluated in terms of the claimant's loss of earning capacity or his degree of medical impairment, for purposes of determining when liability should be transferred to the second injury fund (fund) pursuant to General Statutes (Rev. to 1983) § 31-349.[1]

---

[1] General Statutes (Rev. to 1983) § 31-349 provides in pertinent part: "Compensation for second disability. Payment of insurance coverage for totally incapacitated persons. The fact that an employee has suffered previous disability, or received compensation therefor, shall not preclude him from compensation for a later injury, nor preclude compensation for death resulting therefrom. If an employee who has previously incurred, by accidental injury, disease or congenital causes, total or partial loss of, or loss of use of, one hand, one arm, one foot or one eye, or who has other permanent physical impairment, incurs a second disability by accident or disease arising out of and in the course of his employment, resulting in a permanent disability caused by both conditions which is materially and substantially greater than that which would have resulted from the second injury alone, he shall receive compensation for the entire amount of disability, including total disability, less any compensation benefits payable or paid with respect to the previous disability, and necessary medical care, as elsewhere provided in this chapter, notwithstanding the fact that part of such disability was due to prior accidental injury, disease or congenital causes. The employer by whom the employee is employed at the time of the injury, or his insurance carrier, shall in the first instance pay all awards of compensation and all medical expenses provided by this chapter for the first one hundred four weeks of disability. As a condition precedent to the liability of the second injury fund, the

Although the claimant, Peter Williams, is not a party to this appeal, he originally brought a claim for compensation against several of his former employers, their insurers and the fund. The defendant employers are Best Cleaners, Inc., Windsor Dry Cleaners, Broadbrook Cleaners and Nu-Life Cleaners[2] (collectively referred to as the employers).[3] The workers' compensation commissioner[4] (commissioner) awarded compensation to the claimant and ordered liability for the claim transferred to the fund in accordance with § 31-349. The workers' compensation review board (board) affirmed the decision of the commissioner. The fund appealed the board's decision to the Appellate Court, and the appeal was transferred to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c). We reverse the decision of the board.

employer or his insurance carrier must, ninety days prior to the expiration of the one-hundred-four-week period, notify the custodian of the second injury fund of the pending case and shall furnish to said custodian a copy of the agreement or award together with all information purporting to support his claim as to the liability of the second injury fund, and shall make available to the custodian all medical reports as the custodian shall desire. Failure on the part of the employer or the carrier to comply does not relieve the employer or carrier of its obligation to continue furnishing benefits under the provisions of this chapter. In the event the custodian shall reject the claim of the employer and its insurer, the question shall be submitted to the commissioner having jurisdiction, as promptly as possible, and the employer or carrier shall continue furnishing benefits until the outcome is finally decided, and if the employer or carrier prevails all payments made beyond the one-hundred-four-week period shall be reimbursed to the employer or carrier by the second injury fund."

[2] The defendant Nu-Life Cleaners did not file a brief in this appeal. The dispute before this court is solely between the fund, the employers and their workers' compensation insurers.

[3] The employers' insurers are Peerless Insurance Company, Home Insurance Company, Aetna Casualty and Surety Company, Hartford Insurance Group and American Motorists Insurance Company. Although the insurers are parties in this appeal, we refer only to their insureds.

[4] Darius J. Spain, acting in his capacity both as commissioner-at-large for the first district and as commissioner for the fifth district, awarded benefits to the claimant and ordered the transfer of liability to the fund. References to the commissioner are to Spain.

The underlying facts are undisputed. The claimant worked in the dry cleaning business for the employers between 1963 and 1983. Part of the claimant's job during that time consisted of removing items of wet clothing from a cleaning tank and placing them in a dryer. The cleaning fluid used on the clothes was perchloroethylene, a volatile chemical that is widely used throughout the industry as a cleaning agent. The claimant was exposed to this chemical in its liquid or vapor form throughout his entire career in the dry cleaning business.

In the late 1970s, the claimant began to experience breathing problems. In 1977, he was diagnosed as suffering from asthma. In 1982, when the claimant's asthma symptoms became persistent, he was referred to Thomas J. Godar, a pulmonary specialist. The claimant furnished Godar with the following history. He was fifty-nine years old, and had smoked cigarettes from age ten until he was forty-eight. He had worked in the dry cleaning business, where he was exposed on a regular basis to perchloroethylene and other cleaning solutions. On the basis of this history, Godar performed pulmonary function tests on the claimant, and these tests revealed that the claimant was suffering from obstructive airway disease with an asthmatic component. The claimant left his last employer in May, 1983, and subsequently sought workers' compensation benefits.

During the hearing before the commissioner, Godar testified extensively about the claimant's medical condition. No other expert medical testimony was elicited before the commissioner. Godar explained that the claimant had a 50 percent impairment of his respiratory capacity, and that represented the median percentage of impairment even when the claimant was under a full regimen of medication. Godar estimated that "something in the range of a 10 to 20 percent loss in function

. . . was probably related to his smoking . . . ." He explained that this meant that 10 to 20 percent of the claimant's 50 percent loss of respiratory capacity, or 5 to 10 percent of the original capacity, was due to smoking. The remainder—80 to 90 percent of the percentage loss, or 40 to 45 percent of the original capacity—was due to the claimant's prolonged exposure to perchloroethylene while he worked in the dry cleaning industry. Godar stated that the smoking related impairment was "a marginal element of impairment," and that he did not "think the smoking had an effect in terms of [the claimant] not being disabled now had he not been a smoker."

Godar also testified on the issue of whether the claimant could function in a work environment. According to Godar, the claimant's exposure to perchloroethylene had sensitized his lungs and respiratory system, so that even common irritants such as cold air and perfume could induce serious breathing problems. Godar suggested that the claimant "could do probably sedentary work under conditions where there was no smoking, no significant volatile chemicals or fumes involved in the process, and with reasonable environmental control, which would include air conditioning for the summer months, he could do sedentary work." Godar later stated, however, that "[i]n the real world I'm not of the opinion that he is employable. I think if you look at his lung function under ideal circumstances you would say, well, he could do something, yes, he could. The question is, who would hire him, and how long would he hold that job? And under those circumstances it's been my experience that [he is] not employable."

The commissioner concluded that the claimant was totally disabled and that his labor had become unmarketable. The commissioner implicitly found that, as a result of his continuing exposure to perchloroethylene throughout his employment in the dry cleaning busi-

ness, the claimant was suffering from a 50 percent impairment of his respiratory system. The commissioner further found that the claimant had smoked for more than thirty-five years, and that this history of smoking had caused "pre-existing lung disease" that "caused his airway disease to be materially and substantially worse than it otherwise would have been." In other words, the commissioner found that the claimant's first injury to his lungs, caused by the smoking, and his second injury to his lungs, caused by exposure to perchloroethylene, resulted in a permanent disability "which is materially and substantially greater than that which would have resulted from the second injury alone . . . ." General Statutes (Rev. to 1983) § 31-349. The commissioner subsequently ordered liability for the compensation claim to be transferred from the employers to the fund after the employers had paid 104 weeks of benefits. The fund appealed from the decision of the commissioner to the board, which affirmed the commissioner's decision with respect to the transfer.[5]

---

[5] The fund raised nine issues in its appeal from the commissioner to the board, which were consolidated into four issues by the board: (1) liability for the claimant's compensation benefits should not have been transferred to the fund because there was no evidence to support the commissioner's finding that there was permanent physical impairment resulting from the claimant's many years of smoking; (2) liability should not have been transferred because the commissioner found no subordinate facts that supported his conclusion that the claimant's airway disease had been made materially and substantially worse by the preexisting lung disease; (3) the commissioner had miscalculated the amount of the award due the claimant; and (4) because there were two lungs involved, the commissioner should have ordered the employer to pay 104 weeks of liability for each, or 208 weeks total, before transferring liability to the fund. In consolidating the issues, the board eliminated the fund's sixth ground, which has become the substantive issue in this appeal. The fund's sixth ground is that "[t]he Commissioner erred by failing to find that the claimant's permanent disability was not made materially and substantially worse due to pre-existing lung disease." The board affirmed the decision of the commissioner on the first, second and fourth issues, but remanded the case to the commissioner for further consideration as to the amount of the award due the claimant. That issue was subsequently resolved by the commissioner.

On appeal to this court, the fund renews its claim that the commissioner should not have ordered liability for the claimant's compensation benefits transferred from the employers to the fund pursuant to § 31-349. Following oral argument in this court, it became apparent to this court that the central issue in this case turned on the definition of "disability" in § 31-349. We therefore ordered the parties to file supplemental briefs addressing the following issues: (1) "In the context of General Statutes § 31-349, does 'disability' refer to the claimant's inability to work and loss of earning capacity, or to his degree of medical impairment?" and (2) "Under the circumstances of this case, was the claimant's permanent disability 'materially and substantially greater than the disability that would have resulted from the second injury alone,' within the meaning of General Statutes § 31-349?"

With respect to the issues we framed, the relevant portion of § 31-349 provides for a transfer of liability to the fund if an employee with a permanent physical impairment "incurs a second disability by accident or disease arising out of and in the course of his employment, resulting in a permanent disability caused by both conditions which is materially and substantially greater than that which would have resulted from the second injury alone . . . ." The fund does not contest the commissioner's explicit finding that the claimant "did have pre-existing lung disease as a result of his smoking for 35 years" or his implicit finding that this preexisting lung disease constituted a permanent physical impairment within the meaning of the statute. Nor does the fund challenge the commissioner's finding that as a result of his employment with the employers, the claimant sustained a second injury to his lungs. These undisputed findings satisfy that portion of § 31-349 that requires a noncompensable[6] first injury and a compensable sec-

_____

[6] The fund also does not contest that the first injury was noncompensable. " 'It has always been accepted without question that the situation to which

ond injury for transfer to the fund. The question then becomes whether the claimant's first and second injuries resulted in a permanent "disability" under § 31-349, a question which requires that we define "disability."[7]

The fund takes the position that, in the context of § 31-349, "disability refers to the claimant's inability to work and loss of earning capacity and not to his degree of medical impairment." Best Cleaners, Inc., argues that "disability" refers to the claimant's degree of medical impairment. Broadbrook Cleaners and Windsor Dry Cleaners argue that the term "disability" refers both to a claimant's inability to work and to his medical impairment. The term "disability" under the latter argument would therefore refer either to an inability or limitation in a claimant's ability to work, or simply to a worsening physical impairment. We agree with the fund that for purposes of § 31-349 disability refers to the claimant's ability to work, and not to the degree of medical impairment.

Historically, in the workers' compensation system, "disability" has been closely tied to loss of earning capacity. 1C A. Larson, Workmen's Compensation (1995) § 57.14 (b), p. 10-74. More recently, we have held that "[c]ompensation under our [Workers' Compensation] Act is based upon incapacity, total or partial, and

the Second Injury Fund applies consists of a *prior* noncompensable injury followed by and combining with a *subsequent* compensable injury.' (Emphasis in original.) 2 A. Larson, [Workmen's Compensation] § 59.32 (g), p. 10-488." *Levanti* v. *Dow Chemical Co.*, 218 Conn. 9, 17, 587 A.2d 1023 (1991).

[7] Our usual rule is to defer to the construction given a statute by the agency charged with its enforcement. *Connecticut Alcohol & Drug Abuse Commission* v. *Freedom of Information Commission*, 233 Conn. 28, 39, 657 A.2d 630 (1995). Deference is unwarranted, however, when the determination of a term or phrase is "a question of law that ha[s] not previously been subject to judicial scrutiny." *Bridgeport Hospital* v. *Commission on Human Rights & Opportunities*, 232 Conn. 91, 110, 653 A.2d 782 (1995). Because we address for the first time the proper definition of the term "disability" within the context of § 31-349, the board's implicit construction of that term is entitled to no special deference.

hence is based upon loss of earning power." (Internal quotation marks omitted.) *Mulligan* v. *F. S. Electric*, 231 Conn. 529, 541, 651 A.2d 254 (1994). Similarly, in *Levanti* v. *Dow Chemical Co.*, 218 Conn. 9, 15, 587 A.2d 1023 (1991), we recognized that the purpose of the Workers' Compensation Act "is to give to the employee . . . compensation for the loss of wages accruing from the employee's injury." (Internal quotation marks omitted.) In that case, we upheld the validity of a limited schedule that established mandatory benefits payable for the loss or loss of use of a body part, but that did not specifically refer to a loss of earning capacity. We reasoned in *Levanti* that "our legislature must have presumed that the losses therein *affected earning capacity,* because any other construction would suggest that the section was intended to provide compensation solely for the body part itself, comparable to a tort recovery. This construction would be inconsistent with our Workers' Compensation Act." (Emphasis added.) Id., 14–15.

To equate "disability" with degree of medical impairment would be to ignore the focus of the workers' compensation system on earning capacity, and to instead adopt a tort recovery approach for transfer to the fund. Section 31-349 therefore requires more than a showing that a preexisting injury has some measurable effect on, or in some manner augments, a subsequent work related injury. The permanent disability that results from the two injuries refers only to the claimant's earning capacity or ability to work. In other words, the earning capacity of the claimant must be materially and substantially affected by the preexisting injury for employers to be able to transfer liability to the fund under the provisions of § 31-349.

We next address the issue of whether the commissioner's transfer of liability for the claimant's benefits

to the fund, based on the incorrect standard,[8] requires that we remand the case for further consideration by the commissioner. "When agency action is overturned . . . because of invalid or insufficient findings . . . a court must ordinarily remand the matter under consideration to the agency for further consideration." (Internal quotation marks omitted.) *Dept. of Health Services* v. *Commission on Human Rights & Opportunities*, 198 Conn. 479, 488, 503 A.2d 1151 (1986); *Feinson* v. *Conservation Commission*, 180 Conn. 421, 429-30, 429 A.2d 910 (1980); *Hartford* v. *Hartford Electric Light Co.*, 172 Conn. 71, 73, 372 A.2d 131 (1976); see General Statutes § 4-183 (j). When the agency, however, is reversed and it appears "as a matter of law that there is only one single conclusion that the [agency] could reasonably reach," this court may direct the agency to take that action on remand. *Feinson* v. *Conservation Commission*, supra, 430; General Statutes § 4-183 (k).[9] We find in the present case, on the basis of the uncontradicted medical evidence before him, that the commissioner could have reached but one conclusion—that is, the first injury did not materially and substantially contribute to the claimant's inability to work.

We tangentially visited the issue of whether a second injury was made materially and substantially greater as

[8] On review, the board held that the claimant "did have pre-existing lung disease as a result of his smoking for over 35 years," and that his "pre-existing lung disease caused his airway disease to be materially and substantially worse than it otherwise would have been. . . . Because [the] claimant had a pre-existent lung function impairment due to smoking and because his present lung disability from airway disease is caused by both conditions . . . *and because the present disability is materially and substantially worse than it would have been from the second injury alone,* liability for benefits is transferred to the Second Injury Fund after 104 weeks of benefits have been paid." (Emphasis added.)

[9] Pursuant to § 4-183 (k), "[i]f a particular agency action is required by law, the court, on sustaining the appeal, may render a judgment that modifies the agency decision, orders the particular agency action, or orders the agency to take such action as may be necessary to effect the particular action."

a result of the first injury in *Levanti* v. *Dow Chemical Co.*, supra, 218 Conn. 17 (evidence that preexisting impairment materially increased claimant's overall disability is sufficient to warrant application of § 31-349). In *Levanti*, however, we did not specifically define "materially" and "substantially." Because there are no statutory definitions of the terms, we look to their commonly approved usage. General Statutes § 1-1 (a); *Police Dept.* v. *State Board of Labor Relations*, 225 Conn. 297, 301 n.6, 622 A.2d 1005 (1993) (" '[w]here a statute does not define a term, it is appropriate to look to the common understanding expressed in the law and in dictionaries' "). Accordingly, we conclude that for the first injury to add materially[10] and substantially[11] to the permanent disability, it must have an important and significant role in the disability, such that an absence of the preexisting injury would mean a measurable lessening of the degree of disability—that is, earning capacity.

In the present case, Godar was the only expert medical witness, upon whose testimony all parties relied. His testimony provides sufficient evidence that the preexisting lung injury related to the claimant's smoking history was not a material and substantial factor in the claimant's permanent disability and resultant unemployability.[12] As we previously noted, Godar referred to

---

[10] We have previously held that a "material" fact is one "which will make a difference in the result of the case." (Internal quotation marks omitted.) *State* v. *Goggin*, 208 Conn. 606, 619, 546 A.2d 250 (1988). Webster's Third New International Dictionary defines "materially" as meaning "to a significant extent or degree."

[11] We have noted that "Webster, Third New International Dictionary, defines 'substantially' as meaning 'in a substantial manner' and it defines 'substantial' to mean 'consisting of, relating to, sharing the nature of, or constituting substance; being of moment, important, essential.' " *Clark* v. *Gibbs*, 184 Conn. 410, 417 n.10, 439 A.2d 1060 (1981).

[12] Under examination by the attorney for Best Cleaners, Inc., Godar responded to the question regarding the claimant's percentage of medical impairment and effect on his disability as follows:

"Q. All right. And, are you able to assess today what part of [the claimant's present impairment] might have been attributable to cigarette smoking by assessing some smaller percentage to that?

the smoking related impairment "as a marginal element of impairment." He also stated that he did not "think the smoking had an effect in terms of [the claimant] not being disabled now had he not been a smoker." The commissioner therefore could reasonably find only that, within the meaning of § 31-349, the claimant's permanent disability that resulted from the second injury

"A. That would be almost blasphemy, since it's really hardly a precise science; but when you're making a gross medical estimate—I would then be forced to estimate something in the range of a 10 to 20 percent loss in function representing some underlying disease that was probably related to his smoking, but assuming we know what his prior lung function was before smoking, none of which information we have.

*So that, in other words, the small portion of the loss would be ascribed to the underlying [preexisting lung disease]; and I refer to that as a marginal element of impairment.*" (Emphasis added.)

Under examination by the fund's attorney, Godar responded to questions regarding the role of smoking on the claimant's present disability as follows:

"Q. If he had not had a smoking history, would he now be out working? [An objection to this question was overruled by the commissioner.]

"A. *I don't think the smoking had an [e]ffect in terms of his not being disabled now had he not been a smoker.*

"Q. So, in other words, in terms of his work function he's pretty much in the position he's in now because of his exposure to the chemicals?

"A. Correct.

"Q. . . . Would it be your opinion that in terms of [the claimant's] loss of lung function that his smoking history has contributed a relatively insignificant part of his total loss of lung function?

"A. Yes.

"Q. And that, really, the substantial and significant part of loss of lung function both in living and in—for job function really is because of his chemical exposure, is that your opinion?

"A. Yes.

"Q. When you give [the claimant] a 50—approximately a 50 percent loss of each lung, you're giving that under a very controlled condition, aren't you?

"A. Yes.

"Q. And that that includes a strict regime of being away from factors, from situations which most people would consider ordinary in order to achieve that kind of level?

"A. That's correct.

"Q. And, would it be safe to say that if he was put into a normal, let's say, humanly normal environment that most of us live in that in fact his loss of lung function would actually measure significantly higher?

"A. Yes." (Emphasis added.)

was not made materially and substantially greater by the first smoking related injury.

The decision of the board is reversed and the case is remanded to the board with direction to reverse the commissioner's transfer of liability to the fund.

In this opinion the other justices concurred.